UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NICHOLE JAMES and HEMENE JAMES, wife and husband,<br><br>        Plaintiffs,<br><br>  v.<br><br>KOOTENAI COUNTY, a political subdivision of the State of Idaho, KOOTENAI COUNTY CORONER'S OFFICE, a department of Kootenai County, and WARREN KEENE, in his individual and official capacity as KOOTENAI COUNTY CORONER,<br><br>        Defendants. | Case No. 2:19-cv-00460-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendants Kootenai County and Warren Keene's motion for summary judgment. Dkt. 35. The Court conducted a hearing on the motion on June 6, 2022. For the reasons explained below, the Court will partially grant and partially deny the motion.

## BACKGROUND

### A.    The Accident

Olivia Pakootas was only 21 years old when she encountered a sweeping left

curve driving down Highway 58 on the Coeur d'Alene Reservation. *Accident Report*, Ex. AA, Dkt. 35-6. Her car—which was moving too fast for the turn—ran off the road, became airborne, and rolled several times in a nearby field. *Id.* Olivia was ejected from the car and died at the scene in the early evening of June 1, 2018. *Id.*

Soon after, Olivia's mother, Plaintiff Nichole James, learned that Olivia had been in a car accident and rushed to the scene. *Nichole James Dep*. 23:21-24:18, Ex. A, Dkt. 35-4. She hurried towards the ambulance parked near Olivia's upside-down car, but as she drew nearer, glimpsed Olivia's body and realized that her daughter was not in the ambulance. *Id.* at 26:7-29:15. Ms. James recalled that in unimaginable moment, "I screamed until I couldn't scream anymore. And her shoe was knocked off and her sock was hanging off of her foot, so I fixed her sock. And then I laid down next to her and I sang her my great-grandma's lullaby." *Id.* at 30:22-31:1. Ms. James explained that "time moves kind of weird" in her memory of what happened after that. *Id*. at 31:18-19. She told Olivia's biological father, Tom, that their daughter had died. *Id.* at 31:12-34:5. He came to the scene, alongside other family members, including Plaintiff Hemene James, Ms. James's husband and Olivia's stepfather. *Id.* at 31:12-34:5; *Id.* at 27:19-38:24.

At some point, Ms. James talked with Deputy Coroner JoAnn Porter, who

led the coroner's office investigation at the scene. *Id*. at 34:23-36:14. Ms. Porter knew the coroner's office would request an autopsy, as it did for every fatal car accident. *JoAnn Porter Dep*. 19:3-20:11 Ex. D, Dkt. 35-4; *Warren Keene 30(b)(6) Dep*. 140:19-21, Ex. E, Dkt. 35-4. Ms. Porter remembers telling Ms. James that Olivia's body would be transported to a funeral home and then to the medical examiner's office for autopsy. *Porter Dep*. at 72:23-74:6. For her part, Ms. James recalls that she knew Ms. Porter was with the Kootenai County coroner's office, that they spoke, and that she likely signed a form, but not the substance of what they said. *N. James Dep.* at 39:15-40:3; *Id.* at 47:2-49:22.

After the conversation, Ms. Porter placed Olivia's body in a body bag. *Porter Dep.* 59:18-60:7. Representatives from English Funeral Home collected Olivia's body and transported it to the funeral home. *Id.* at 72:21-22. Upon leaving the accident site, Ms. Porter sought and received permission from Dr. Keene to request an autopsy. *Id.* at 20:12-24. She then sent an autopsy request to the medical examiner's office. *Id.* at 18:10-18.

Meanwhile, family members started carrying out religious practices to prepare Olivia for her journey across the creek—into the afterlife. *N. James Dep*. 42:6-43:25. At the accident site, they made a tobacco offering, spoke prayers, and sang songs. *Id; Hemene James Dep.* 21:19-22:14, Ex. B, Dkt. 35-4. They collected

the earth she had lain on, any remaining hair or blood, and her clothing and possessions. *N. James Dep*. 42:6-43:25; *H. James Dep*. 39:5-12. In short, they wanted to ensure that Olivia did not leave anything behind. Some family members smudged themselves, the accident scene, and, eventually, Olivia's apartment with sweet grass, sage, and cedar. *N. James Dep*. 52:22-53:3, 56:6-56:24.

Later that evening, Olivia's family gathered at Ms. James's home. *Id*. at 51:20-52:7. As Ms. James explained, according to the family's religious beliefs, Olivia was "not gone yet," but was "walking around" and at risk of getting lost. *Id*. at 55:24-56:24. The family needed to perform very specific religious practices to help Olivia make her journey. Ms. James's brother, Francis SiJohn, outlined the steps the family would need to take over the next three days to ensure that Olivia's journey across the creek would be smooth. *See id*. at 58:17-62:25; *H. James Dep*. 76:6-83:14, 100:7-103:13; *see also Complaint*, Dkt. 1.

Initially, Olivia would be embalmed. After that, on Saturday, the women in the family would prepare and pray over rose water. After washing themselves with the rose water and praying, they would use the same water to wash Olivia's entire body. Next, they would comb, braid, and place flowers in her hair and dress her in her wing dress, leggings, and moccasins. Once the women finished, the men in the family would then place her in the coffin and sing and pray over her. Then, on

Saturday night, Olivia's body would be brought to her mother's house for a family night. Her parents, siblings, and other family members would spend the entire night talking with her, praying with her, and allowing her to be home. The family would eat their last meal with her at a midnight dinner. At sunrise on Sunday, the pall bearers would go to the sweat lodge to prepare to carry Olivia's body. They would smudge their children with ashes from the sweat lodge. In the afternoon, Olivia's body would be taken to the Long House for a community wake and rosary. Finally, on Monday, they would hold a funeral and bury Olivia. It was important to complete the process within three days of the accident.

### B.     Burial Preparations and Burial

The morning after the accident, Saturday June 2, Ms. James learned through her brother that the coroner's office would autopsy her daughter. *N. James Dep*. 86:14-87:20. Ms. James did not know about the autopsy, did not want an autopsy, and did not know where Olivia's body was being held. *Id.* Her brother suggested Olivia's body was likely at the coroner's office. *Id.*

Ms. James found the coroner's office phone number online. *Id.* at 88:6-90:19. She called and left a voicemail asking to be called back immediately. *Id.* She called the chaplain from the accident scene, but he had the same phone number for the coroner's office. *Id.* Ms. James left another voicemail. *Id.* At the same time,

her brothers began looking for information about Olivia's location. *Id*; *H. James Dep*. 52:11-14. Eventually, the next afternoon—Sunday June 3—Francis SiJohn reached the county coroner, Defendant Warren Keene. *SiJohn Decl*. 2-3 Dkt. 52.

The parties disagree about the conversation between Mr. SiJohn and Dr. Keene. Mr. SiJohn recalls explaining that an autopsy would "disrupt" the family's "religious practice of preparing Olivia's body for burial" including "the three-day timeline within which our religious traditions must be carried out." *Id*. He also told Dr. Keene that the family's "religious beliefs consider an autopsy to be a desecration of the body." *Id.* In response to those religious objections to the autopsy, Mr. SiJohn remembers Dr. Keene saying that he was a "man of science" and that "his science 'trumps' our religious beliefs." *Id.* But Dr. Keene says that Mr. SiJohn indicated that the family's opposition to an autopsy was rooted in their cultural—as opposed to religious—beliefs. *Warren Keene Dep*. 23:8-25:24, Ex. C, Dkt. 35-4. Dr. Keene recalls telling Mr. SiJohn that an autopsy was necessary to get scientific evidence about Olivia's accident. *Id.* Dr. Keene does not recollect Mr. SiJohn demanding the return of Olivia's body. *Id.*

After the call, Mr. SiJohn told Ms. James that the coroner's office would not release Olivia's body and would perform the autopsy the next day. *N. James Dep*. 93:3-13. So, on Monday June 4, Ms. James filed a state court action, asking the

court to order the release of Olivia's body and to prohibit an autopsy. *Complaint*, Ex. G, Dkt. 35-5; *Motion for Temporary Restraining Order*, Ex. H, Dkt. 35-5. The court entered a temporary restraining order almost immediately thereafter. *Order*, Ex. L, Dkt. 35-5. The order restrained Dr. Keene from conducting an autopsy, ordered him to release Olivia's body into Ms. James's custody, and directed that Olivia's body be taken to Kramer Funeral Home. *Id.* The court's order further specified that no physical changes were to be made to Olivia's body pending a June 7 hearing. *Id.*

After Dr. Keene learned about the court's order, he went to English Funeral Home to externally examine Olivia's body, take photographs, and take a blood sample. *Keene Dep*. 48:9-49:8. Later that evening, Olivia's body was moved to Kramer Funeral Home, but the family was not permitted to see or touch her. *N. James Dep*. 98:5-102:6; *H. James Dep*. 75:7-14. The next morning, Tuesday June 5, Ms. James and Dr. Keene filed a stipulation to dismiss the state court case, which the court adopted at once. *Stipulated Order to Dismiss*, Ex. P, Dkt. 35-5. Based on the parties' agreement, the court issued an order that prohibited Dr. Keene from ordering or performing an autopsy, directed the immediately release Olivia's body to Ms. James, and dismissed the case. *Id.*

After the restraining order was lifted, Mr. Kramer began the embalming

process. *N. James Dep*. 105:2-106:6. Early on Thursday afternoon, Ms. James and female family members were able to wash and dress Olivia. *Id.* On Friday, Olivia's body was taken to the Long House for a community wake and funeral, and then buried. Ms. James and her family were not able to bring Olivia's body home for a family night. *Id.* 109:1-111:18; *H. James Dep*. 76:3-79:25. The pall bearers were unable to go to the sweat lodge or to smudge the children with the ashes. *Id.* The family was delayed by three to four days in their burial preparations and did not bury Olivia within three days of her death. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Where, as here, the party moving for summary judgment would not bear the burden of proof at trial, that party may prevail simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact—a fact "that may affect the outcome of the case." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). In evaluating whether the moving party has met this burden, the Court must view the evidence in the light most favorable to the non-moving party and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).

Once the moving party has met its burden, the non-moving party carries the burden to present evidence showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323.  The non-moving party must go beyond the pleadings and show through "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Id.* at 324.

## ANALYSIS

About a year and a half after Olivia died, Ms. and Mr. James initiated this action against Kootenai County and Dr. Keene in his individual and official capacity.[1] In their first claim, brought under 42 U.S.C. § 1983, the Jameses allege that Kootenai County and Dr. Keene violated their First and Fourteenth Amendment rights. Additionally, the Jameses bring claims for intentional and negligent infliction of emotional distress under Idaho state law. Finally, the Jameses ask for injunctive relief. In the present motion, Kootenai County and Dr. Keene move for summary judgement as to all claims. The Court will address each claim in turn.

### A.    First Amendment Claim

The Jameses claim that Dr. Keene and Kootenai County violated their First Amendment Free Exercise rights. The Free Exercise Clause, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend I; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). A plaintiff may demonstrate the

---

[1] Although plaintiffs named the Kootenai County Coroner's Office as a defendant, the parties agreed at the hearing that it is not a separate legal entity and so should be dismissed as an improper party to this action.

infringement of his rights under the Free Exercise clause in numerous ways, "including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist*., 142 S. Ct. 2407, 2421 (2022) (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U. S. 872, 879-81 (1990)). Such a showing establishes a First Amendment violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S., 520, 546 (1993)).

The Jameses have clearly shown that Kootenai County and Dr. Keene burdened their religious exercise by curtailing the scope and timing of their burial rituals. Because Dr. Keene did not release Olivia's body and requested an autopsy, the Jameses could not begin burial preparations immediately and were not able to bury Olivia within three days of her death. In addition, due to the delay in obtaining the body, the Jameses were not able to bring Olivia's body home for a family night and could not complete the sweat lodge rituals. It is undisputed that these practices constitute sincerely motivated religious exercise.

The next question is whether, in burdening the Jameses' religious exercise,

Dr. Keene acted pursuant to a neutral and generally applicable rule.[2] The parties argue that the Court should apply this test to the Idaho statues that give county coroners discretion to determine the scope of investigation and whether to order an autopsy.[3] The Court disagrees.

The relevant rule is Dr. Keene's policy of performing autopsies for every fatal car accident.[4] Even taking into account the factual disputes about the exact nature of the policy[5], the overall rule is clearly established. What is more, the

---

[2] The Court rejects defendants' contention that plaintiffs have impermissibly raised a new legal theory on this front. Plaintiffs have consistently asserted a Free Exercise claim, which the Ninth Circuit has recognized requires the court to "*first* determine the appropriate level of scrutiny" to apply. *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1183 (9th Cir. 2021) (Ikuta, J. dissenting) (emphasis added). This determination is not so much a legal theory as a necessary analytical step. The very fact of a Free Exercise claim should have put defendants on notice that the neutrality and general applicability of the laws and policies would be at issue.

[3] Idaho law provides that the county coroner "shall investigate" a death that occurs under particular conditions, including "as a result of violence" or "under suspicious or unknown circumstances." Idaho Code § 19-4301(1). The law further provides that the coroner "may conduct an inquest if there are reasonable grounds to believe as a result of the investigation that the death occurred" under those conditions. Idaho Code § 19-4301(3). In addition, Idaho law provides that a county coroner "may order an autopsy performed if it is deemed necessary accurately and scientifically to determine the cause of death." Idaho Code § 19-4301(B).

[4] Dr. Keene testified that that his office has an "unwritten policy" that "[a]ll fatal traffic accidents need an autopsy" because "[t]hat's the way I want it done." *Keene Dep.* 100:12-22. *See also id.* at 131:24-25 ("[I]t's my policy that we autopsy all fatal crashes, victims."); *Keene 30(b)(6) Dep.* 90:1-6 ("[T]he first policy that my office has is that all fatal car crashes need to have an autopsy."); *id.* at 11:19-21 ("The only verbal policy that started on the first day I became coroner is that all fatal car crashes are to be autopsied.").

[5] Although Dr. Keene considers the rule an unwritten policy, there is evidence that the (Continued)

---

**MEMORANDUM DECISION AND ORDER - 12**

record clearly shows that Dr. Keene and his staff ordered Olivia's autopsy pursuant to this practice, making the rule the direct cause of the Jameses' alleged injuries. *See, e.g.*, *Porter Dep*. 73:9-19 (explaining that Olivia's body would be autopsied "because we do autopsies on all motor-vehicle accidents and crashes"). More importantly, the analytical approach of looking to Dr. Keene's autopsy rule is consistent with the Supreme Court's analysis of similar questions in Free Exercise cases. *See, e.g.*, *Kennedy*,  42 S. Ct. at 2419, 2422 (scrutinizing a school district's "policies"—which consisted of disciplinary action, a letter explaining the disciplinary action, a Q&A document provided to the public, and an employee performance evaluation—rather than the laws authorizing the district to implement those policies); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021) (examining a section of Philadelphia's standard foster care contract rather than the law empowering the city to engage in foster care contracts).

      The Court cannot conclude that Dr. Keene's autopsy rule was neutral with

-------------------

rule took other forms. Deputy Coroner JoAnn Porter, for instance, testified that the rule "is our standard of operations," but "I don't think it is an actual policy." *Porter Dep*. 79:8-11. And Deputy Coroner John Hunt similarly testified that "[w]e generally autopsy all of our car wreck victims. . . .  I don't think there's a policy that says you will, no. It's the standard practice. . . . [I]t's just what we always do." *John Hunt Dep*. 27:4-28:3, Ex. F, Dkt. 35-4. But Chief Deputy Acebedo testified that the coroner's office has "a written policy in regards to motor-vehicle accidents in dealing with the decedents." *Lynn Acebedo Dep*. 68:9-11, Ex. C, Dkt. 38-1.

**MEMORANDUM DECISION AND ORDER - 13**

respect to religious practice. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1730-32, (2018) and *Lukumi*, 508 U.S. at 533). *See also Lukumi,* 508 U.S. at 532-534 ("[T]he minimum requirement of neutrality is that a law not discriminate on its face."). Construing the facts in the Jameses favor, the Court finds that Dr. Keene's autopsy rule targeted religious beliefs based on two pieces of evidence. First, when directly confronted with the Jameses' religious objections, Dr. Keene stated that his science trumped their religious beliefs. *SiJohn Decl*. at 2. Second, by setting up an autopsy rule that always prevailed over religious objections, Dr. Keene flaunted Idaho's coroner inquest law, which clarifies that "[n]othing in this section shall be construed to affect the tenets of any church or religious belief." Idaho Code § 19-4301(5).

Construed in the plaintiffs' favor, these two pieces of evidence show that Dr. Keene created an autopsy rule specifically designed to be intolerant of religious beliefs. That is not to say that Dr. Keene merely failed to grant a religious exception to a generally applicable autopsy rule. *See Reply*, Dkt. 44 at 6-7. Rather, the Court concludes that there is evidence that Dr. Keene created his rule, at least in part, with the object of discriminating against religion. This showing establishes

a First Amendment violation unless Kootenai County and Dr. Keene can satisfy strict scrutiny. But they did not even try to meet that standard. *See Reply*, Dkt. 44 at 3.  Accordingly, the Court cannot grant summary judgment.

For similar reasons, defendants' municipal liability argument fails. For Kootenai County to be liable under § 1983, the Jameses must establish not only that they were deprived of a constitutional right, but that Kootenai County had a policy, which amounted to deliberate indifference to that right, and which was the moving force behind the constitutional violation. *Plumeau v. School Dist. #40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). Because the Jameses have shown a violation of their First Amendment Free Exercise rights, the issue is the county's policy. The precise nature of Dr. Keene's autopsy rule, and whether it would in fact be a policy for the purposes of establishing the county's § 1983 liability is a genuine issue of material fact. *See supra* fn 4 & fn 5. Moreover, the evidence that Dr. Keene's autopsy rule targeted religion could also support a finding that the autopsy rule amounted to deliberate indifference to Free Exercise rights.

### 1.  Qualified Immunity

Although the Jameses showed a Free Exercise violation, their claims against Dr. Keene in his personal capacity must be dismissed if he is entitled to qualified

immunity. That doctrine "protects government officials from suits for money damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (internal quotation and citation omitted). Once a defendant has plead qualified immunity, "the burden is on the plaintiff to prove two elements: (1) that the right was violated; and (2) that the right was clearly established at the time of the alleged misconduct." *Id.* (citation omitted). Because the Court may address the prongs in any order, it will look to the second prong first. *Id.* (citation omitted).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "[C]learly established law should not be defined at a high level of generality," but "must be particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation and citation omitted). Although Supreme Court precedent "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

The Jameses have not met their burden to show that the right in question—

the right to refuse an autopsy based on religious beliefs or to have a family member's body released in a certain time period to prepare the body for burial in accordance with religious beliefs—was clearly established in June 2018. They point only to the Ninth Circuit case, *Marsh v. County of San Diego*, holding that

> A parent's right to choose how to care for a child in life reasonably extends to decisions dealing with death, such as whether to have an autopsy, how to dispose of the remains, whether to have a memorial service and whether to publish an obituary. Therefore, we find that the Constitution protects a parent's right to control the physical remains, memory and images of a deceased child against unwarranted public exploitation by the government.

680 F.3d 1148, 1154 (9th Cir. 2012). This case is inapplicable. *Marsh* recognized the relevant rights as a substantive due process right whereas the Jameses have plead a First Amendment claim. Additionally, the Ninth Circuit set out a constitutional parental right to control a child's remains "against unwarranted public exploitation by the government," which is not a component of this case. *Id.* Moreover, *Marsh*'s pronouncement that "a family's control over the body and death images of the deceased . . . is also protected by substantive due process" defines the right at a high level of generality. In short, *Marsh* does not show that the constitutional question is beyond debate.

The Jameses' argument about Idaho Code § 19-4301C is equally unavailing. Although qualified immunity may turn on the clarity of an asserted statutory right,

that statutory right must be based in federal law. *Compare Golden State Transit Corp. v. Los Angeles* 493 U.S. 103, 105 (1989) ("Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.' As the language of the statute plainly indicates, the remedy encompasses violations of federal statutory as well as constitutional rights.") *with Carroll v. Carman*, 574 U.S. 13, 16 (2014) ("A government official sued under §1983 is entitled to qualified immunity unless the official violated a statutory . . . right that was clearly established at the time of the challenged conduct."). Accordingly, the Court concludes that Dr. Keene is entitled to qualified immunity.

## B.     NIED and IIED State Claims

Next, the Court turns to the Jameses' state law claims for both negligent and intentional infliction of emotional distress. Although Kootenai County and Dr. Keene offered numerous theories to support their motion for summary judgment as to those claims, none are persuasive. Nevertheless, the Court will address each.

### 1.  ITCA Immunity

Kootenai County and Dr. Keene first claim that they are immune from suit under the Idaho Tort Claims Act. Although "under the ITCA liability is the rule and immunity is the exception," one such exception is the "planning prong". *Rees v. State*, 137 P.3d 397, 406 (Idaho 2006) (quoting *Sterling*, 723 P.2d at 758-59).

The planning prong of the ITCA provides that,

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . . [a]rises out of any act or omission . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

Idaho Code § 6-904(1).

To the extent that the Jameses challenge Dr. Keene's discrete decision to order an autopsy, he is not entitled to immunity under the ITCA. True, Idaho statutes and caselaw demonstrate that the decision to order an autopsy is discretionary. *See* Idaho Code § 19-4301B. But a decision does not automatically fall within the planning prong's scope because it involves "*any* element of choice, judgement, or ability to make responsible decisions." *Czaplicki v. Gooding Joint Sch. Dist.*, 775 P.2d 640, 645 (Idaho 1989). Rather, the nature and quality of the challenged action determine whether the exception applies. *Id.* For example, "[r]outine, every day matters not requiring evaluation of broad policy factors will more likely than not be 'operational.' Decisions and actions which involve a consideration of the financial, political, economic and social effects of a given plan or policy will generally be 'planning' [discretionary] and fall within the discretionary function exception." *Bingham v. Franklin County*, 796 P.2d 527, 532

(Idaho 1990). Here, Dr. Keene's decision to order an autopsy in this particular case is better categorized as an operational function outside of planning prong immunity.

That said, the Jameses' alleged damages also arise from Dr. Keene's policy of performing autopsies in every instance of a fatal car crash. And that policy fits with the planning prong's exception. However, the claims are nevertheless not fit for summary judgement. As discussed previously, there is some factual dispute about the nature of the policy, and specifically, whether it was written and whether it is best characterized as a standard of operations or standard practice rather than a policy. *See supra* fn 4 & fn 5. With that ambiguity in the factual record, the Court cannot adequately determine whether Kootenai County and Dr. Keene are entitled to ITCA immunity. Equally important, the statue offers immunity only to planning decisions made "without malice." Here, as the Court has already set out, there is some evidence that, construed in the Jameses' favor, shows that Dr. Keene in fact acted with malice towards religious beliefs in forming his policy. *See supra* Part A.

### 2. Coroner's Inquest Law

Kootenai County and Dr. Keene next argue that the Court should grant summary judgement because of Idaho's coroner's inquest law. They contend that they are immune to the Jameses' state law claims because the law provides that

"*[w]hen an autopsy has been performed*, pursuant to an order of a coroner or a prosecuting attorney, no cause of action shall lie against any person, firm or corporation for participating in or requesting such autopsy." Idaho Code § 19-4301B (emphasis added). That section is inapplicable here because an autopsy was not performed. This is not, as Kootenai County and Dr. Keene contend, an "absurd interpretation of the law." *Reply,* Dkt. 44 at 15. Rather, it is a literal reading of the plain text of the statute.

In a separate argument, Kootenai County and Dr. Keene rely on the law's provision that "[w]here a body is held for investigation or autopsy . . . the coroner shall, if requested by next of kin, release the body for funeral preparation not later than 24 hours after death or discovery of the body, whichever is later." Idaho Code § 19-4301C. Kootenai County and Dr. Keene urge the Court to grant summary judgement because this portion of the coroner's inquest law does not afford a private right of action and because they complied with the statutory requirements. Neither argument is persuasive.

As a factual matter, Kootenai County and Dr. Keene are right that the statute does not provide for a private right of action for violations of Idaho Code § 19-4301C. But they are incorrect about the legal effect of that fact in this case. To make an obvious point, the Jameses have not stated claims for violation of

Idaho Code § 19-4301C. Rather, they have brought claims for the intentional and negligent infliction of emotional distress. In a nutshell, they claim that although Olivia died on a Friday, they could not collect her body until Tuesday because of intentional, extreme and outrageous, or negligent actions, which caused them emotional distress. The Jameses cite Dr. Keene's alleged violation of Idaho Code § 19-4301C as evidence to support that claim. That is entirely appropriate and does not show that Kootenai County and Dr. Keene are entitled to summary judgement. *See O'Guin v. Bingham County,* 122 P.3d 308, 313 (Idaho 2005) ("In Idaho, it is well established that statutes and administrative regulations may define the applicable standard of care owed . . . .'").

For the same reasons, defendants' argument that they in fact complied with the statue is unavailing. Showing compliance with the statute does not establish, as a matter of law, that the Jameses' state law claims fail. It is obviously possible that the Dr. Keene complied with the statute *and* that the Jameses were not able to collect Olivia's body until Tuesday because of intentional, extreme and outrageous, or negligent actions, which caused them emotional distress. As such, this argument is not grounds for granting summary judgment.

### 3.  Failure to Set Bond According to Idaho Code § 6-610

In addition, Kootenai County and Dr. Keene argue that the Jameses' state

law claims are barred because they did not comply with Idaho Code § 6-610. That statute provides that when a plaintiff files a civil action "against any law enforcement officer . . . [that] arises out of, or in the course of the performance of his duty" the plaintiff must file two sureties alongside the complaint. Idaho Code § 6-610(2). The statute further provides that if a plaintiff is subject to this requirement, but does not comply, "the judge shall dismiss the case." Idaho Code § 6-610(5). In this case, the Jameses did not post a bond prior to filing the suit. Kootenai County and Dr. Keene argue that the plaintiffs' state law claims are therefore barred because the coroner is a law enforcement officer under the statute's definitions. Once more, the argument falls short.

Idaho Code § 6-610(1) defines "law enforcement officer" to include three categories of people. [6] *Athay v. Stacey*, 196 P.3d 325, 331 (Idaho 2008). The issue here is whether the coroner belongs in either the portion of the first category that covers "any other person charged with the duty of enforcement of the criminal, traffic or penal laws of this state" or the second, catchall category of "any other law enforcement personnel." Idaho Code § 6-610. Kootenai County and Dr. Keene

---

[6] The Court is bound to follow the Idaho Supreme Court's interpretation of the state statute, although on at least one other occasion, the federal court has interpreted the categories differently. *See Cusack v. Idaho Dep't of Corr.*, No. 1:11-cv-00303-REB, 2012 U.S. Dist. LEXIS 19948, at *9 (D. Idaho Feb. 15, 2012).

offer three reasons that the coroner is a law enforcement officer within these categories.

First, Kootenai County and Dr. Keene point to the coroner's duty to investigate deaths and to "promptly deliver to the prosecuting attorney of each county having criminal jurisdiction over the case copies of all records relating to every death as to which further investigation may be advisable." Idaho Code § 19-4301D. But recommending that a law enforcement officer conduct further investigation is not the same as enforcing the law. Second, defendants emphasize that in some circumstances, the coroner has a duty to conduct inquests. *See* Idaho Code § 19-4301. In that limited forum, the coroner swears jurors, Idaho Code § 19-4302, subpoenas and examines witnesses, Idaho Code §§ 19-4303-04, and may issue a warrant for arrest of a killer, Idaho Code §§ 19-4308-10. Again, that quasi-judicial inquest does not make the coroner an officer, a prosecutor, or a judge because he cannot arrest, prosecute, or sentence the killer. *See In re Sly*, 76 P. 766, 768 (Idaho 1904). Third, Kootenai County and Dr. Keene turn to Idaho law authorizing the coroner "to act as the substitute for the sheriff if the sheriff declares that they are disqualified from acting due to a conflict of interest in a proceeding or matter, and when doing so, the coroner possesses all powers and duties of the sheriff." Idaho Code §§ 31-2806-07. But the ability to step into a law enforcement

role is not the same as otherwise occupying a law enforcement role.

Simply put, none of these arguments are persuasive. At bottom, Kootenai County and Dr. Keene can only argue that Idaho law sets up a close relationship between the coroner and law enforcement. Although the coroner undoubtedly plays an important role in supporting and assisting law enforcement officers as *they* enforce the laws, the coroner cannot do so himself. Paradoxically, the close relationship only emphasizes the distinction between the two roles. *See* Idaho Code § 19-4301A (requiring a person who finds a body to "notify either the coroner, who shall notify the appropriate law enforcement agency, or a law enforcement officer or agency, which shall notify the coroner.").

### 4.  Failure of Proof

Finally, the Court will briefly address the Jameses' alleged failure of proof on the state law claims. In their motion for summary judgment, Kootenai County and Dr. Keene argued only that "Plaintiffs' state law claims are barred on numerous grounds." *Motion*, Dkt. 35-1 at 17. They did not point out "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Nevertheless, in reply, defendants claimed that the Court should grant summary judgment because the Jameses responded to the arguments raised in the motion, but did not attempt to prove the essential elements of their case. *Reply*, Dkt. 44 at

17. This argument is waived—and borders on bad faith—because Defendants raised it only in their reply brief.

### C.     Injunctive Relief

Finally, the Jameses' request for injunctive relief is not appropriate for summary adjudication. Summary judgment is appropriate as to claims and defenses. Fed. R. Civ. P. 56(a). Under Idaho law, injunctive relief "is a remedy—not a cause of action." *Newton v. MJK/BJK, Ltd. Liab. Co.*, 469 P.3d 23, 28 (Idaho 2020). Accordingly, the Court cannot determine that the Jameses' prayer for injunctive relief fails as a matter of law.

## ORDER

1.     Defendants' motion for summary judgment (Dkt. 35) is partially granted and partially denied.

   a.     Dr. Keene is entitled to qualified immunity. The claims brought against him in his personal capacity are **DISMISSED**.

   b.     The Kootenai County Coroner's Office is **DISMISSED** as an improper party to this action.

   c.     The motion is **DENIED** in all other respects.

DATED: September 29, 2022

B. Lynn Winmill
U.S. District Court Judge

**MEMORANDUM DECISION AND ORDER - 27**